Council, you may proceed. Thank you. May it please the board, my name is Matt Belcher. I represent F.B.O.B.E.K. Today we're arguing a manifest weight case. If there was one law that I could point out to you that was mistaken, it would be much easier. I have to sort of go through some of the testimony and some of the evidence that's on the record. So, first I'd like to point out that the arbitrator's decision is as set forth on the eighth page of his ninth page award. It states that the petition's description of the time spent on activities is accurate as far as seeing the total hours she worked each day. The second is that her estimates of the weight of her tools such as the mop and the vacuum were excessive. And then three, was part of her demand for seeking a modification of her work duties. Whether she requested that the bathroom be removed. Those are the primary reasons that the arbitrator concluded that Ms. Bobek was not credible. And then we rely upon the testimony of Dr. Carroll. And so I'm going to go through a little bit of that. And so your claimant's testimony in those matters was not contradicted by the evidence or by Ms. Latosha, her supervisor? Correct. You're saying it was not? Correct. There's some small differences, and I'll go through them very quickly. I would point out that the main contradiction is that Ms. Latosha said that mopping requires no force. And I'd submit to you that the court, anyone who's mopping, mopping requires some force. If we would begin with Section 16 of the Act, Section 16 of the Act requires that the process and procedure before the commission shall be simple and summary, as reasonably may be. As we look to the respondents briefly, we see that at least they considered that the commission found it persuasive that the four initial treating positions did not provide medical causation opinion. I'd like to point out they didn't say that it was not workable. Nobody asked them. This procedure is supposed to be simple and summary as possible. Also, the treating orthopedist, Dr. Zinn, he's Polish-speaking. Ms. Boback is Polish-speaking. She's the only person who got the chance to interact with her in her native language. He concluded in his medical records that, in fact, her condition was work-related and that she had bilateral carpal tunnel. Well, while you're on his testimony, I believe one of the problems the commission had specifically with his opinion was that he gave his causal connection opinion 15 months after his diagnosis. And two months after her surgery, according to McRae v. Industrial Commission, quote, the commission was at liberty to discount the credibility of a physician's opinion on causation, and it was made 14 months after the claimant's alleged injury. So what do you have to say to that principle? Sir, the opinion that they relied upon, Dr. Carroll, was later than that. Okay. So why would Dwinsett carry the date? Well, if we're going to choose the one that's closer in proximity to the manifestation date, then the treating physician, Dr. Zinn, wins. I mean, if that's our rule, if that's the measure, the measure for what he used to decide is days and time, then the days and time of Dr. Carroll are later than the treating physician. Well, that isn't the only metric, because the commission specifically said why they took Carroll's opinion over Dwinsett's, because it said Dr. Carroll's opinion and testimony was rendered after reviewing complete medical records, the job description, and the claimant's description of her work duties. Okay. Dwinsett did not testify at the hearing before the arbitrator. Correct? Yes, Judge. Okay. So if you want to be as simple a summary as possible, if the medical records contain his opinion, I appreciate that, you know, we can continue to take deposition after deposition, and perhaps the commission felt that we should have taken the deposition of Dr. Zinn. But I submit to you that it can't be a simple summary. We're going to take everybody's deposition. The amount of money, the controversy in this matter, is less than the amount of money that Dr. Carroll bills in a month for doing diabetes. I want to give due deference to your argument here. So the commission honed in on two areas, lack of credibility of the claimant and the opinion of Dr. Carroll over Dr. Dwinsett. So why are they required to find your claimant credible when they pointed out that the supervisor, who as I understand is a relative, some kind of a relative of your claimant, testified and contradicted your claimant's description of the work done? Sure. And I'll just go over it really fast. So if we start with this. Page 82 of the transcript. Is the vacuum heavy? We're asking Ms. Latoccia. She says no, the vacuum is not heavy. What does heavy mean? Do you know how much? And then we ask Ms. Boback. So this is the claimant. We ask her, do you know how much the mop weighs? I'm asking you, do you know how much the mop weighs? Ms. Boback. I don't know. Now, listen, the mop I understand. But here's something that I think is really critical and I want you to answer this directly if it's true. Did the claimant admit, did the claimant ever admit that her description of how much time she spent on each of her duties, if accurate, far exceeded the eight-hour work day? Because if she did, that would obviously impugn her credibility. Sure. Did she admit that? She described it. Correct. But she did describe activities that if we add them all up is more than eight hours. But I'd like to direct your attention to Petitioner's Exhibit Number 8, which is 1227 of the record. This is the physical job analysis performed, created by the second witness in the case, Ms. Deamer. It says that this is the job analysis prepared by the respondent. Eight hours of walking. Eight hours of standing. Seven hours of bending. Six hours of twisting. Six hours of pushing and pulling. Eight hours of reaching. Eight hours of lifting less than 10 pounds. Eight hours of lifting less than 25 pounds. And then one hour of lifting more than 25 pounds. If we add up the respondent's job analysis, we get two weeks worth of work. So the idea that we're going to use that metric to decide that Ms. Boback isn't telling the truth, I would submit, would not be the best description of this situation. Ms. Boback, we've been in private practice. Ms. Boback didn't come to my office to have me argue this case in the appellate court. Ms. Boback came to my office because she submitted a piece of paper saying that she would like to be accommodated. She would like to have some light duty restrictions. Respondent did accommodate those restrictions. That's why she comes to my office. She didn't come to my office to have this case argued here. She just wanted to go back to work and have her restrictions accommodated. Dr. Carroll says that she has bilateral carpal tunnel. Dr. Carroll says that she has bilateral carpal tunnel because, well, she's a photo lawyer. She has a history of diabetes. She has a history of hypertension. And she's going to LA today. She doesn't have diabetes. So it's a complete mistake. Dr. Carroll doesn't know anything about her job activities. He doesn't mention anything in the 16 pages of his direct testimony about her job activities. He didn't even think it was correct. He didn't even know she died. This is page 14. Diabetes changes the environment. A lot of blood flow around the nerve in a number of locations. Consider a risk factor for the cause of carpal tunnel. It's very true with the bloodstream. It does in the small intestine. So she doesn't have diabetes. Let's keep moving on. Let me ask you this. Yes, Judge. Honing on your most critical points. Did you know, curious practitioner, in the CAP case, a decision of the commission is against the manifest weight of the evidence only, or it happens that the conclusion is fairly apparent? Tell us specifically why, out of the totality of the evidence, the commission's decision was against the manifest weight of the evidence. Now, you can counter all of the arguments and findings of the commission with your arguments, but why would we reverse the commission? Why is it against the manifest weight of the evidence? It doesn't make any sense.  Dr. Carroll, their examiner, said that rapid tissue secretion with force causes carpal tunnel. Dr. Carroll said that she has bilateral carpal tunnel. Dr. Carroll said that she needed the first surgery, and she needs a second surgery. Dr. Carroll says she's not in any line. Dr. Carroll says, what are her restrictions? No lifting more than 5 pounds. Avoid the force work. The wrong section of the law says she can't lift more than 5 pounds. Why? We know that she lifts more than 25 pounds at her job. There's no relationship between her activity with lifting things more than 5 pounds and her present condition. Why does Dr. Carroll have her restrictions of no lifting more than 5 pounds? Well, don't we have a situation here where the present condition, she has carpal tunnel? Is that correct? Yes, Judge. Okay. The issue is, what causes the carpal tunnel? Is there a cause for the carpal tunnel? Yes, Judge. Okay. And we have one physician who says there are these factors. A, she has diabetes. Gender. Okay, I've seen that in these opinions. And that that is the cause of her carpal tunnel. And who do we have saying that it is the work activities? The treating physician, Dr. Treatment. And in this decision, R.G. Construction, I think it was written by Justice Hoffman, it's Mr. Lexie's case, opinion of Dr. Silver in that case written and contained in the medical records, of course there's no requirement that such opinions can't be reduced into medical records, as long as they're not created for the purpose of litigation. And I submit to you that Dr. Treatment's records here, they weren't created for the purpose of litigation. She went from one physician, Dr. Mess, to another physician who spoke Polish. He concluded that the other person listened to her. Dr. Carroll didn't speak Polish, Dr. Carroll didn't have a translator. Dr. Carroll couldn't ask her any questions. Dr. Carroll didn't know that she did work in a vacuum. Dr. Carroll's report mentions nothing but forceful activity and repetition. He doesn't know that she's doing repetition work. During the cross-examination, he learns for the first time that she's doing repetition work, doing vacuuming. Ms. Latosha said vacuuming two hours. My client said more than two hours. So my client says it's heavy. Well, if you have a restriction of no less than 1.5 pounds, things seem heavy to you. She has active carpal tunnel syndrome. Even though there are such total examiner appeals, they concluded so. So of course it's heavy to her. So here's the length of the tool, the vacuum. My client said it was about 20 pounds. The testimony of the respondent was about 20 pounds. And yet the arbitrator said that because my client was excessive in her description of the tools, that he found them not to be heavy. But we know that they both agreed that it's 20 pounds. So if you consider, this is the testimony of Ms. Latosha. You know, she's a very nice lady, I'm sure. But she's pretending she hasn't done this job that Ms. Bogach is doing. On page 80 of her testimony, do you have to forcefully push the button? No. Is there anything really forceful about the job? No. And I submit to you that the opposite is plainly apparent. Anyways, if a mom knows it requires some force, and if Dr. Carroll thinks that 5 pounds is heavy for Ms. Bogach, obviously that 5 pounds is heavy in her perception as well. Well, didn't Dr. Carroll testify his opinion was based not only on a review of the medical records in the past description, but upon the claimant's own description of her work duties? Except that she didn't speak English. He didn't speak Polish. And if you look at his deposition transcript, he said that he's got no record of having a translator. So I don't know how he could have come to this conclusion. But in his direct portion of his testimony, he simply said that she has diabetes and she's a woman. She's a little bit overweight. She's 5 foot 7 and weighs 180 pounds. And that she has a history of hypertension. But if you look at the way that he unpacks that, so this is page 13 of his deposition. The doctor, what are your opinions with regard to her diagnosis and causation? So answer me. This is Dr. Carroll. I felt that she did have Parkinson's syndrome in the diagnosis. I did not refer that to the activities she attempted in her work activities in the job script which she told me. But that's what he says. She didn't speak Polish. She didn't speak English. What do you believe to be the cause of Ms. Goldbeck's bilateral carpal tunnel? Our risk factors are that she's overweight for her height. She's 180 pounds and 5'7". She has a history of diabetes. We know that that's false. Had a history of hypertension and was a middleweight. So as we unpack that further, he said, well, you know, it's not really clear what the weight is. And it's not really clear about this history of hypertension. And it is a risk factor to be a middle-aged woman. But the idea that we don't take our claimants as defined, I think, is inconsistent with the law as well. I mean, this lady goes to work. She does bilateral carpal tunnel. Their examiner said that she has it. All treatment is reasonable except for some physical therapy notes. Counsel, you have time in the floor. Yes, Judge. Counsel, you may respond. May I please report? Good morning, Your Honors. Counsel, Emily Morg on behalf of ABM Industries. As much as I don't want to, I'm going to go out of order a little bit because I think there are some key points to address in the arguments that counsel just presented. The first of which being that there was some sort of language barrier between the Section 12 examiner, Dr. Carroll, and the petitioner. We submitted it to evidence as Respondents Exhibit 3, the invoice for the translator that was present at the IME. And Dr. Carroll did not offer testimony that there was no translator present. He offered testimony that he didn't report it. So Respondents submitted proof that there was, in fact, a translator there. And that's kind of another theme that's presented in the brief is that, well, Dr. Duane, Dr. No. 6, he was the doctor that spoke Polish. But the only thing that's present in the record is that she felt more comfortable with Dr. Duane. There's nothing in the record that says that there was any communication barrier between the petitioner and Doctors 1 through 5. All right. So in summary, you're saying that issue, the impediment of the language problems are right here in this case. Yes. Absolutely. I think another argument that I want to stress that petitioners spent a significant amount of time on today and in the brief is this sort of another red herring, that Dr. Carroll, because he said that Petitioner has diabetes and she doesn't have diabetes, somehow now that opinion is not. Well, that could theoretically be a problem if an expert's opinion is based on a flawed factual foundation, couldn't it? I would say if Dr. Carroll's opinion was the petitioner has diabetes and therefore this condition cannot be work-related. But that wasn't his opinion. His opinion was the job activities are not of sufficient repetition and force, period. That was his opinion. And then he looked to other potential, as counsel just mentioned, risk factors. He didn't state it's caused by diabetes, it's caused by hypertension, it's caused by age. He said these are potential risk factors and it's not caused by work. Counsel, I'm curious what the opinions were in regards to causation in general relative to the development of carpal tunnel. It's between Dr. Carroll and the treating physician. As I read the briefs here, Dr. Carroll seemed to express the opinion that carpal tunnel can only be caused by use of vibratory tools. Is that accurate or not? Not entirely. Really what he said is you have to have sufficient repetition plus sufficient force. You know, there was a suggestion that that was a surprise, this force element. But if you read the report, the I.D. report and the deposition, it's entirely consistent. And all the doctor does is expound on that and say there's force required here. And it's noteworthy that at the deposition there was no objection to that testimony. So this isn't the first case where this has come up, but it used to be that the classic case of carpal tunnel was a clerical worker who had developed carpal tunnel as a result of keyboard usage. And this concept of use of vibratory tools doesn't seem to fit into that at all. And the answer only if it's in the record here. I don't want you to, you know, go beyond the brief. But did the experts in this case talk about a change in medical thought in terms of the development of carpal tunnel? Is it now only thought to occur in the use of vibratory tools? Well, again, I think the key element is the force. I think if it's a sufficient vibration, Dr. Carroll stated it could be a causative factor, but he noted a vibration from a regular vacuum would not qualify. So it's understood that the claimant here wasn't a clerical worker, but the gripping of a broom, a mop, that sort of thing. Just gripping alone is insufficient to cause carpal tunnel, per Dr. Carroll. Is that correct? Yes, that's correct. And I think it's important, too. Dr. Carroll has been doing this a long time. I'm sure you've seen him come up often in these cases. And I don't want to go outside the record, but... Yeah, we can't take judicial notice of it. Expertise, can we? Well, I mean, his DV, I think, which is admitted to evidence, is very clear of his expertise. But I also want to go back to the point that, you know, because I do think it's important to recognize that we had these five doctors involved. There was no causation opinion. We're on Dr. Stig's, and this is the doctor that she was referred to by her attorney. And there's this argument that, well, because, you know, they didn't refute causation. And to that response, I say they don't have to. The commission weighed the totality of the evidence and looked at the fact that she presented to these doctors. She presented timelines. She presented histories. And the physicians in Illinois certainly know, if you have a carpal tunnel diagnosis, we're going to be looking at causative factors. Had she discussed, we have to assume, that had she discussed her work activities being a causative factor in her pain or her condition, that it would have been mentioned. This is petitioner's burden of proof, and particularly in a repetitive trauma case. Were the commissions relying on medical evidence? The commission weighed the fact that five physicians did not support causation. And I would just again point to the standard review, which you noted, and that the decision is not to be disturbed unless an opposite conclusion is clearly apparent. And just finally, the cases that are cited by the appellant in the brief on appeal, I think, can easily be dismissed. They're sort of broad themes that Peoria Bellwood, which sets forth the law on repetitive trauma. He's making the argument that it stands for the proposition that carpal tunnel can be compensable, which we already know. And we're assimilating an industrial laundry worker with a cleaner in this case because they're both working in housekeeping. And I think those jobs on their face are dramatically different. Similarly, the reliance on Johnson was sort of a suggestion that because there was medical evidence presented on causation, that you have to accept that as a compensable claim. And that is certainly not the law. The reliance on Feerick is also misplaced where, in that case, the IME agreed with causation. So I believe, Your Honors, that evidence in this record fully supports the decision of the commission. No opposite conclusion is clearly apparent. And therefore, we respectfully request that you affirm the decision of the commission. Thank you, Counsel. Counsel, you may reply. Carpal tunnel is not compensable for Dr. Carroll. Secretary, carpal tunnel is not compensable for Dr. Carroll. Did he say that? Yeah, and I'll tell you why right now. First of all, I'd like to draw attention to the fact that there's between $12,000 and $15,000 a week in IMEs. So that's what his CV says. Do you agree that IMEs and risks are exposed to vibrations during vacuuming? Depends on the vacuum. Do you ask Ms. Bowder what type of vacuum she used? No, I did not require it. That's the nature of the one, and one will not produce two. Did you talk to her at all about vacuuming? Well, I knew that she vacuumed because most people who clean, from washing and off the set, do vacuum. But I did just specifically interrogate her and ask her about the vacuuming aspect of it. And you did not report that she vacuumed in your report? Well, my job is to involve my understanding of how people do the job, but I did specifically document that. You're correct in pointing that out. You were talking about force tonight. Did you discuss force at all in your report, Dr. Carroll? I don't know that I specifically mentioned force in and of itself in the report. I did talk about the things that I came up with. There was a lot I was looking at from the jury. Question. Did you testify that you think a sufficient force to raise your daughter's spinal syndrome would be in the 25-pound range? If that's it, answer. I would have taken that as a potential guide. Yes. I direct your attention to the second page of the exhibit. This is the job description. Bathing, stooping, standing, pushing and pulling, and reaching on a repetitive basis throughout the day, with or without reasonable accommodations. You testified that your understanding of Loewe's work involved imperative use of her hands and wrists, that it would be your opinion that her work may have caused a relationship with a carpal tunnel. Answer. If it involves force, it's where I was with all of that. Repetition in and of itself did not meet the criteria. So if there's repetition combined with significant force, not significant force, throughout the course of the day, throughout the course of the day, that might or could change my opinion. Does pushing and pulling and reaching with the hands and wrists involve force? Answer. It can. It can also be done without force. So it depends on the nature of the work. If this rollback is required to push, pull, and reach on a repetitive basis throughout the day, and then we refer to the 21 different job needs on the third page, don't you think it's a reasonable conclusion that the pushing, pulling, and reaching is involving force to accomplish those job needs? Answer. Many of these things do not require significant force to do that. And then you combine it with a variety of different activities that are involved. It gives you different times and thresholds for recovery. So I certainly acknowledge that your client uses her hands, but I don't find the variety of activities in and of themselves are forceful. And by virtue of doing a variety of activities, that she can also change postures and wrists in practice for repetition. And this report says she's pushing and pulling for six hours a day. Answer. It doesn't mention that. And further, she's reaching and lifting up to 25 pounds a day for eight hours a day. Answer. That's correct. Doctor, would you consider pushing and pulling, reaching, and lifting for six to eight hours each day to be repetitive? Could be. And how many hours of this data in this mobile app is required to grasp or carry every day? Answer. I would say six, I believe, for grasping. Yes. And Karen, is he? Sorry, are you saying this is a jump sign, Dr. Carroll? Dr. Carroll, never mind. Well, and certainly with this concept of the necessity of sufficient vibratory force being essential to the diagnosis of the problem, are you saying that's jump signs? Yes. So was there a challenge to the opinion? Yes. Dr. Carroll immediately asked, did you have access to any of this information? I mean, did you move the bar? We did not move the bar. Well, it was supposed to be played by the commission, correct? Sure. And with regards to the moving the bar, just drawing attention to it, it was elicited from the witness, was her understanding of doctor restrictions. The arbitrator objected, and we wouldn't let her talk about it because he said that that was her giving a medical opinion. So, just two quick examples of what the situation was here. Question. This is both. After your discussion with Dr. Stiglitz, what was the understanding of the cause of your problem? So this is her present sense of pressure. What is it when she sees Dr. Carroll's office? Opposing counsel. Objection. Calls for medical opinion. Therapy. Sustained. So, could we move the bar? The doctor's opinion? Sure. This is the arbitrator's explanation. Well, it's an understatement communicated by the doctor. It's an understatement communicated by our doctor. I mean, I don't... It would be an opinion. Here's... It would only be the doctor's opinion. So, yes, of course, I mean, under the circumstances, I think that you're right. It would be nice if the arbitrator would bar it, but I don't think that that would have happened, especially after this conversation. You were given certain restrictions after your visit with Dr. Ness. Dr. Ness answered. Dr. Ness gave them earlier. And do you recall what those restrictions were? Answer. This is my client. He said avoid the bathroom. Question. And this was Dr. Ness. Answer yes. Question. Why did he say to avoid the bathroom? Objection. Here's the... Here's your objection. Sustained. It also asks for a medical opinion. So, in an ideal world, we would have had the most accurate possible evidentiary guidance in place, and we would have been in a position to then bar Dr. Carroll's opinion. Dr. Carroll makes a very substantial living doing just this. And I submit to you, based on your vast experience with the situation, is that no way has been approved for carpal tunnel under any circumstances for this planer at ABM, which is certainly a disservice to my client, who worked there for 21 years. She's 58 years old. Same building. Shows up for work and says, I've had one carpal tunnel, can I get my due restrictions? And they fail to comment. And then now we find ourselves in this situation. It's on the wall behind me. It says, this is the other side. So, I ask that you do. Thank you. Thank you, counsel, both, for your arguments in this matter. This morning will be taken under advisement, and a written disposition shall issue. Will the clerk please call the next...